## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | CIVIL ACTION NO. _____ |
| Plaintiff, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY, AMBER GROVE, in | : | |
| her individual capacity and in her | : | |
| official capacity as the Pennsylvania | : | |
| State University's Title IX Coordinator, | : | |
| and SARAH KERN, in her individual | : | |
| capacity, | : | |
| | : | |
| Defendants. | : | |

---

## COMPLAINT

---

AND NOW, Plaintiff John Doe,[1] by and through his counsel, Babst, Calland,

Clements and Zomnir, P.C., asserts the following causes of action against

Defendants The Pennsylvania State University ("Penn State" or "the University"),

---

[1] Contemporaneously with this Complaint, Plaintiff John Doe also files a Motion for Leave to Proceed by Pseudonym, given the extremely sensitive nature of the facts and circumstances giving rise to this Complaint and to respect federal law requiring that student disciplinary proceedings remain confidential. For the same reason, Plaintiff refers to the complainant in the underlying disciplinary proceeding as "Jane Roe," and to the two eyewitnesses to the alleged misconduct as "Witness #1" and "Witness #2."

Amber Grove, and Sarah Kern, and in support thereof, avers the following based upon Plaintiff's most recent knowledge, information, and reasonable belief:

## INTRODUCTION

1.    In August 2023, Mr. Doe's life was devastated and forever changed by a demonstrably false report of sexual misconduct—and by an educational institution more concerned with salvaging its once-celebrated reputation than seeing justice served.

2.    Penn State initiated a formal Title IX investigation into a false report of sexual misconduct filed by Jane Roe against Mr. Doe in January 2023, against a backdrop of high-profile institutional failures and a wave of public criticisms.

3.    That backdrop began in January 2014 when—in the wake of revelations of Jerry Sandusky's sexual abuse of minors and Penn State's "grievously deficient failures" in response to those allegations of abuse—the Office of Civil Rights ("OCR") of the U.S. Department of Education initiated a sweeping investigation and compliance review of Penn State's policies and practices.[2]

4.    That investigation culminated in a blistering 30-page Compliance Review Letter issued on March 26, 2020, in which OCR found that Penn State's

---

[2] A true and correct copy of OCR's March 26, 2020 OCR Compliance Review Letter ("Compliance Review Letter" or "Letter") is attached hereto as **Exhibit A**.

policies and practices had resulted in myriad Title IX violations over multiple academic years.

5.    The Letter criticized, among other things, Penn State's failure to ensure adequate, reliable, and impartial investigation of Title IX complaints, as well as its practices that resulted in the hearing panels adjudicating Title IX complaints being deprived of relevant information.

6.    The Letter also identified instances in which Penn State treated female students more favorably than male students during the Title IX investigative process.

7.    Penn State agreed to overhaul its Title IX policies and assured OCR that it would do better going forward.

8.    Penn State continued to face public pressure over the next several years—including a new wave of student and media pressure in the spring of 2023, just as its investigation of Ms. Roe's complaint was getting underway.

9.    A *Centre Daily Times* article published on April 18, 2023, proclaimed that "students' trust in PSU is falling" and "Penn State's undergraduate students do not trust their university to take reports of sexual misconduct seriously."[3]

---

[3] A true and correct copy of the *Centre Daily Times* article is attached hereto as **Exhibit B**.

10.    The article detailed the results of a recent survey of Penn State's students, focusing exclusively on reports and concerns of female and gender-diverse undergraduate students.

11.    The article reported that less than half (42.9%) of female undergraduate students at Penn State trusted the University to take a report of sexual misconduct seriously, and still fewer (41.9%) trusted the University to handle a report fairly.

12.    The article also underscored that those figures represented a "significant drop" from prior surveys in 2018 and 2015—precisely the opposite sort of press Penn State wanted just three years after OCR's Compliance Review Letter made headlines.

13.    All of this, of course, was occurring within the broader context of major social movements—#MeToo and Time's Up—which sparked a global reckoning with and elevated consciousness regarding historical injustices against victims of sexual harassment and sexual misconduct.

14.    As is reflected in a growing number of federal lawsuits, universities often react to media reports, governmental oversight, and other external pressures by overcorrecting and adopting practices of selective enforcement and bias against male students.[4]

---

[4] *See, e.g.*, *Abraham v. Thomas Jefferson Univ.*, No. 20-2967, 2024 WL 1120987, at *20–21 (E.D. Pa. Mar. 14, 2024) (collecting cases illustrating the effects of external

15.    Penn State proved itself to be no exception, developing policies and implementing practices which, in seeking to correct historical injustices toward women, resulted in unfair presumptions against men.

16.    Perhaps no one put it better than Mr. Doe's assigned Title IX advisor in the spring of 2023, who intimated to Mr. Doe that if the Title IX investigation came down to a "he-said, she-said" credibility question, "*she will win*."

17.    When Mr. Doe's father asked that same advisor several months later why he had not recommended that Mr. Doe retain a lawyer in connection with the Title IX proceedings, the advisor repeated the same refrain: this was a "he-said, she-said" case, so it was all but inevitable that "she will win."

18.    That default presumption of guilt for male students is deeply problematic in and of itself; allegations of sexual misconduct must be taken seriously, but to blindly assume their truth and discard the legal presumption of innocence violates the most basic notions of fairness and due process.

19.    Even more troubling is the prospect that University officials charged with fairly administering Title IX might step in to ensure that a finding of

---

pressure, including media reports and government oversight, on institutional policies and practices); *see also Doe v. Univ. of Sci.*, 961 F.3d 203, 210 (3d Cir. 2020) (discussing cases addressing allegations of government and public pressure and holding that such allegations, together with some indicia of an intent to punish male students, establish a plausible Title IX violation).

responsibility against the male student is not just a presumption but a foregone conclusion.

20.    Sadly, that is precisely what happened in Mr. Doe's case.

21.    Defendants Amber Grove, then Penn State's Title IX Coordinator, and Sarah Kern, the assigned Title IX Investigator, failed at every turn to investigate Ms. Roe's complaint reasonably and fairly and actively worked to ensure that Mr. Doe was unable to present a meaningful defense.

22.    Ms. Grove and Ms. Kern placed the burden on Mr. Doe to prove his innocence and do the work of gathering evidence and identifying witnesses, in direct contravention of University policy.

23.    Despite having the discretion to do so, Ms. Grove and Ms. Kern refused to continue the Title IX Hearing to accommodate a material eyewitness, Mr. Doe's roommate, Witness #1, even though they were advised more than a month in advance that Witness #1 wanted to testify but was unavailable on the hearing date due to a U.S. Army Reserve Officers' Training Corps ("ROTC") commitment.

24.    Ms. Grove and Ms. Kern also failed to inform Witness #1 that, although they were holding the hearing date firm, he had the option to testify remotely while away at his ROTC training.

25.    Ms. Grove conducted an interview of Witness #1 two weeks before the Title IX Hearing, so she was fully aware that his information was highly exculpatory and fully corroborated Mr. Doe's account of consensual sexual intercourse.

26.    Yet when a member of the Hearing Panel asked whether anyone had spoken to Witness #1, Ms. Kern lied to the Hearing Panel and told them that he was nonresponsive and unwilling to participate in the investigation.

27.    Astonishingly, Ms. Grove—the Penn State official charged with ensuring its Title IX policies are fairly administered and who had interviewed Witness #1 just two weeks prior—sat silently and failed to correct her employee's false statement.

28.    As a direct result of Defendants' actions, the Title IX complaint came down to a he-said, she-said credibility question, and despite the many contradictions and vacillations in her testimony, Ms. Roe "won."

29.    Mr. Doe was found responsible for violating Penn State's Title IX policy and was suspended indefinitely from the University.

30.    Overnight, Mr. Doe's life was turned upside down.

31.    Mr. Doe went from a vibrant 19-year-old with a promising academic and professional career, fulfilling personal friendships, a job he loved, and the formative college experience he had worked so hard for, to a shell of himself, forced to leave his hopes and dreams behind, move home with his parents, and begin the

difficult work of putting the pieces of his life back together—all due to Defendants' constitutional and statutory violations.

32.    Mr. Doe seeks injunctive, declaratory, and monetary relief (including punitive damages) to address Defendants' flagrant violations of his constitutional and statutory rights.

33.    But above all else, Mr. Doe seeks to clear his name and hold Penn State and the other Defendants accountable for their actions.

## **THE PARTIES**

34.    Plaintiff John Doe is an adult individual and former student of the Defendant, Pennsylvania State University.

35.    Defendant Pennsylvania State University is a public land-grant university with campuses throughout the Commonwealth of Pennsylvania. Mr. Doe attended its flagship University Park campus, located in State College, Pennsylvania.

36.    Defendant Amber Grove is an adult individual who was, at all times relevant to this Complaint, the Title IX Coordinator for Penn State acting under color of state law. Ms. Grove is sued in her individual and official capacities.

37.    As Title IX Coordinator, Ms. Grove was the leader of the Title IX Office and was responsible for, among other things, ensuring the University complied with federal Title IX policies, developing University policies as required by Title IX, and overseeing all University investigations of allegations of sexual

harassment and sexual misconduct arising under Title IX. Ms. Grove was therefore a decisionmaker with final authority to establish, regulate, and implement policy for the University with respect to issues arising under Title IX.

38.    Effective February 1, 2024, Penn State promoted Ms. Grove to the role of Chief Ethics and Compliance Officer. In that role, Ms. Grove continues to oversee Penn State's Title IX program, as well as all other compliance efforts across Penn State.

39.    Defendant Sarah Kern is an adult individual who was, at all times relevant to the above-captioned lawsuit, a Title IX Investigator for Penn State acting under color of state law. Ms. Kern is sued in her individual capacity.

## JURISDICTION AND VENUE

40.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Mr. Doe's claims arise under the U.S. Constitution and the laws of the United States.

41.    Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391, because the events giving rise to Mr. Doe's claims occurred within this judicial district, 28 U.S.C. § 1391(b)(2), and because Penn State is considered to reside within this judicial district, 28 U.S.C. § 1391(b)(1).

## SUMMARY OF ACTION

### Penn State Has an Unfortunate History of Title IX Violations

42.    Title IX of the Education Amendments of 1972 protects students, educators, and others, from discrimination based on sex in education programs or education activities that receive federal financial assistance.  20 U.S.C. § 1681(a); 34 C.F.R. § 106.31(a).

43.    Penn State is a recipient of federal funding and therefore required to fully comply with the provisions of Title IX and its attendant regulations.

44.    Penn State has a long and unfortunate history of failing to meet those obligations.

45.    In January 2014, in the wake of the Jerry Sandusky scandal, OCR initiated an investigation and compliance review of Penn State's policies and practices.

46.    The investigation spanned more than six years and culminated in the Compliance Review Letter.

47.    The review targeted Penn State's handling of complaints alleging sexual misconduct and, in particular, complaints alleging sexual assault.

48.    As part of its investigation, OCR reviewed more than 300 case files involving reports of alleged sexual harassment and sexual assault at Penn State.

49.     OCR found that Penn State had violated Title IX in multiple ways over the course of the 2016–2017 through 2019–2020 academic years.

50.     Among its findings, OCR concluded that, during the 2019–2020 academic year, Penn State's Title IX policies "failed . . . to ensure adequate, reliable, and impartial investigation of complaints."

51.     OCR also identified as a "concern[]" that Penn State previously had a policy of prohibiting nonparty witnesses from testifying during Title IX hearings, preventing the hearing panel from considering all relevant evidence.

52.     The Letter acknowledged that this problematic policy of depriving the hearing panel of relevant information had led to multiple civil rights lawsuits filed with this Court alleging violations of procedural due process.

53.     As another example of the University keeping relevant evidence from the panel, OCR noted a case in which University officials redacted large swaths of the respondent's statement before submitting it as part of the information packet to the hearing panel and precluded the respondent from asking pertinent questions during the hearing itself.

54.     This violation too prompted a federal civil rights lawsuit in this Court, resulting in a temporary restraining order enjoining the respondent's academic suspension.

55.    The report also revealed instances of disparate treatment of male respondents as compared to female complainants.

56.    For example, in one case, the University imposed a "no contact" order on the male respondent, but when the respondent complained to the University that the female complainant and her friends had been harassing him online and at his place of work, the University merely told the female complainant to be more "considerate" of what she was posting online.

57.    OCR concluded that "there are serious inadequacies in how the University treats both complainants and respondents in cases of alleged sexual harassment that need correction in order to bring the University into compliance with Title IX."

58.    Penn State entered a resolution agreement with OCR on March 18, 2020, in which it agreed to resolve the violations and concerns identified in OCR's Compliance Review Letter.

**Despite Adopting a Revised Title IX Policy, Penn State Has Faced Continued Public Pressure to Ramp Up Its Discipline of Students—Especially Male Students—Who Are Accused of Sexual Misconduct**

59.    Penn State issued a revised Title IX policy effective August 14, 2020, in accordance with the Compliance Review Letter and the resolution agreement.[5]

---

[5] A true and correct copy of Penn State's Title IX policy is attached hereto as **Exhibit C**.

60.    The policy states that Penn State is "committed" to ensuring that no person is discriminated against on the basis of sex at the University.

61.    The policy also outlines the University's obligations and the complainant's and respondent's rights with respect to any Title IX investigation.

62.    The policy provides that, while the complainant and respondent in a Title IX proceeding "are encouraged to provide all pertinent information to the investigators," the "burden of gathering evidence remains at all times on the University."

63.    With respect to the Title IX hearing itself, the policy now allows nonparty witnesses to offer testimony.

64.    It also allows a party to cross-examine any witness, subject to a determination of each question's relevance by the hearing panel.

65.    To ensure all relevant evidence is considered, the hearing panel is authorized to hear evidence not previously provided to the Title IX investigator during the course of the investigation.

66.    The revised policy grants the University broad discretion to extend deadlines for any aspect of a Title IX proceeding as it deems appropriate.

67.    Despite adopting the revised Title IX policy, Penn State has remained under intense public scrutiny following the Sandusky scandal and has faced

continued public pressure to ramp up its discipline of those students, especially male students, who are accused of sexual misconduct.

68.    In April 2023, while the Title IX investigation at issue in this case was ongoing, Penn State released the results of its 2022 Sexual Misconduct Climate Survey.[6]

69.    In a news release accompanying publication of the survey results, Penn State offered selective excerpts of the survey's findings.

70.    The news release touted, for example, that "52.2% of undergraduates . . . agreed the University would take a report of sexual misconduct seriously."

71.    Ms. Grove is quoted in the news release as stating that the Title IX office is "engaged in ongoing assessment to identify our strengths and isolate areas for enhanced focus," and that she "look[s] forward to continuing that work, including preparing a future-oriented strategic plan, informed by the results of this survey."

72.    A *Centre Daily Times* reporter dug deeper into the survey results and, in an article published April 18, 2023, announced that "students' trust in PSU is falling":

---

[6] A true and correct copy of the 2022 Sexual Misconduct Climate Survey is attached hereto as **Exhibit D**.



PENN STATE

## Penn State's survey on sexual misconduct climate shows students' trust in PSU is falling

BY JOSH MOYER
UPDATED APRIL 18, 2023 9:10 AM

73.     The article cast the results of Penn State's survey far more negatively than the University's news release, opening with the statement that "Penn State's undergraduate students do not trust their university to take reports of sexual misconduct seriously."

74.     The article focused exclusively on reports and concerns of female and gender-diverse undergraduate students.

75.     The article reported that "only 42.9% of female undergrads – and 24.6% of gender-diverse undergrads – believe Penn State would take a report of sexual misconduct seriously."

76.     The article emphasized that figure is a "significant drop" from 2018 (when the number for female undergraduate students was 62.9%) and 2015 (when it was 72.8%).

77.    The article also reported that "[o]nly 41.9% of female undergraduate students – and 20.2% of gender-diverse undergraduate students – believed Penn State would handle a report fairly."

78.    The article noted that this, too, was a substantial decrease from the numbers reported in 2018 (57.5% of female undergraduate students) and 2015 (66.7% of female undergraduate students).

79.    The report revealed that female undergraduate students distrusted Penn State at all levels of the Title IX process: from maintaining safety, to providing support, to ensuring their reports would be taken seriously and handled fairly.

80.    A University spokesperson described the findings as "troubling" and a "cause for concern," stating that "more work is needed" and the University would "continue to improve our processes and increase confidence and safety for our students."

81.    The spokesperson confirmed that, as of the April 18, 2023 publication date of the *Centre Daily Times* article, the University had "started the conversation" internally to address female students' reported concerns.

82.    It is against this backdrop, and as a result of the attendant motivations, that Penn State initiated a deeply flawed and biased investigation of a false report of sexual misconduct filed against Mr. Doe during the spring and summer of 2023.

**Mr. Doe Enrolls at Penn State and Has a Successful Freshman Year**

83.     Prior to Ms. Roe's false report and Penn State's flawed and biased investigation, Mr. Doe had a promising future ahead of him.

84.     As a senior in high school, Mr. Doe applied to and was accepted to nine different colleges.

85.     He carefully weighed his options and made a calculated decision to attend Penn State, both for the academic opportunities the school offered, particularly its highly regarded Smeal College of Business, and because after a campus tour, he was left with an impression that Penn State was a place where he would be happy and safe.

86.     Mr. Doe was a highly driven high-school student and carried that drive with him to college.

87.     Mr. Doe began attending classes at Penn State during the summer before his freshman year officially began, with the goal of working hard and earning admission into the Smeal College.

88.     Mr. Doe continued his strong work ethic throughout his freshman year and did well academically, ultimately achieving his goal of earning acceptance into the prestigious Smeal College.

89.     Mr. Doe also joined a fraternity and began developing close friendships with his fraternity brothers.

90.    Mr. Doe obtained employment with the University as well, regularly working four hours each morning before attending a full day of classes.

91.    In sum, Mr. Doe was a hard-working, driven, and well-liked college student who had a promising academic and professional future ahead of him as he entered his sophomore year of college.

### Mr. Doe and Ms. Roe Meet at a Fraternity Party and Engage in Consensual Sexual Intercourse on September 1 and September 2, 2022

92.    The Fall 2022 semester began on Monday, August 22, 2022.

93.    During the Fall 2022 semester, Mr. Doe resided at his fraternity, where he shared a bedroom with his roommate and fraternity brother, Witness #1.

94.    On the evening of September 1, 2022, Jane Roe attended a party hosted at Mr. Doe's fraternity with several friends and acquaintances.

95.    Ms. Roe and Mr. Doe met on the dance floor around 10:30 p.m., roughly half an hour after the party began.

96.    Mr. Doe introduced himself to Ms. Roe and the pair exchanged Snapchat contact information.

97.    Both Ms. Roe and Mr. Doe consumed alcoholic beverages while on the dance floor.

98.    Ms. Roe and Mr. Doe flirted and danced together before moving to the bar to replenish their drinks.

99.    Upon returning to the dance floor, Ms. Roe and Mr. Doe resumed dancing and began kissing.

100.    Mr. Doe eventually asked Ms. Roe if she would like to go upstairs to his bedroom, and Ms. Roe said yes.

101.    The fraternity has strict rules against taking alcohol to the second floor, and a fraternity brother stationed at the bottom of the stairs ensured that neither Mr. Doe nor Ms. Roe took alcoholic beverages upstairs with them.

102.    Mr. Doe observed Ms. Roe consume two alcoholic beverages while downstairs and no other alcoholic beverages after the pair went upstairs.

103.    Mr. Doe consumed four or five alcoholic beverages between approximately 8:45 p.m. and when he and Ms. Roe went upstairs sometime after 11:00 p.m.

104.    When Ms. Roe and Mr. Doe arrived upstairs, they discovered that Witness #1 was in the bedroom he and Mr. Doe shared talking to a woman who would later become his girlfriend, Witness #2.

105.    Ms. Roe and Mr. Doe instead went to a common room at the end of the hallway, where they situated themselves on a couch and Ms. Roe sent her friend a message to let her know where she was.

106.    Ms. Roe sat on Mr. Doe's lap while facing him and removed her shirt and bra, and Mr. Doe removed his shirt.

107.    Ms. Roe and Mr. Doe engaged in foreplay, and Mr. Doe obliged when Ms. Roe asked him to give her "hickies" on her chest and neck.

108.    When Ms. Roe took Mr. Doe's hand and placed it in her pants, Mr. Doe told Ms. Roe that they could not have sexual intercourse in the common room and would need to go to his bedroom to do that.

109.    Ms. Roe agreed that they should go to Mr. Doe's bedroom.

110.    The pair moved down the hallway to Mr. Doe's bedroom, and Mr. Doe locked the door to ensure their privacy since the house was full of partygoers.

111.    Ms. Roe and Mr. Doe disrobed one another to their underwear immediately upon entering the room, and Ms. Roe climbed the ladder into Mr. Doe's loft bed, with Mr. Doe following her.

112.    Ms. Roe messaged her friend to tell her that she could go home because Ms. Roe would be spending the night with Mr. Doe.

113.    Ms. Roe then placed her cell phone on the bedrail behind her, where she had access to it throughout the night.

114.    Once in the bed, Ms. Roe removed Mr. Doe's underwear, Mr. Doe removed Ms. Roe's, and the pair engaged in consensual sexual intercourse for roughly 10 to 20 minutes, with Ms. Roe initially positioning herself on top of Mr. Doe.

115.   Approximately 5 to 10 minutes later, Witness #1 and Witness #2 returned to the bedroom, and Mr. Doe unlocked the door for them.

116.   Ms. Roe and Mr. Doe then went to sleep.

117.   Ms. Roe was clearheaded and in full possession of her faculties throughout the evening, and neither her conduct nor her words suggested to Mr. Doe that she was incapacitated or otherwise incapable of consenting to sexual intercourse.

118.   At no point during the evening of September 1, 2022, did Ms. Roe tell Mr. Doe that she wanted to stop their sexual activities or otherwise indicate to Mr. Doe that she was in any way uncomfortable with their activities.

119.   To the contrary, Ms. Roe was an active participant in the pair's sexual activities, directing Mr. Doe both physically and verbally, sitting on top of Mr. Doe's lap in the common room, climbing the ladder into his bed first, and positioning herself on top of Mr. Doe during their sexual intercourse.

120.   Ms. Roe and Mr. Doe awoke at approximately 7:30 a.m. on the morning of September 2, 2022.

121.   Ms. Roe began cuddling against Mr. Doe, and the pair kissed for a short time before Ms. Roe mentioned she had an early morning class.

122.   Mr. Doe joked to Ms. Roe that she would be a "little late," and Ms. Roe replied that it was okay and she could take the bus.

123.   Ms. Roe asked Mr. Doe to check if Witness #1 and Witness #2 were still sleeping, and Mr. Doe obliged and told Ms. Roe he believed they were asleep.

124.   Mr. Doe placed his finger over Ms. Roe's mouth and mouthed "quiet" so that they would not wake Witness #1 and Witness #2.

125.   Ms. Roe and Mr. Doe then engaged in consensual sexual intercourse for approximately 15 minutes.

126.   Ms. Roe asked Witness #2, who by then had woken up, to help her find her clothing on the bedroom floor, and Witness #2 handed Ms. Roe's clothing to her, with the exception of her underwear which they could not find.

127.   Mr. Doe then walked Ms. Roe out of the house and to the front gate and said goodbye.

128.   Ms. Roe was clearheaded and in full possession of her faculties during the morning of September 2, 2022, and neither her conduct nor her words suggested to Mr. Doe, Witness #1, or Witness #2 that she was incapacitated or otherwise incapable of consenting to sexual intercourse.

129.   At no point during the morning of September 2, 2022, did Ms. Roe tell Mr. Doe that she wanted to stop their sexual activities or otherwise indicate to Mr. Doe that she was in any way uncomfortable with their activities.

130.   To the contrary, as was the case the night before, Ms. Roe was an active participant in the pair's sexual activities, initiating their physical contact upon

waking up and positioning herself on top of Mr. Doe for a time during their sexual intercourse.

### Over Two Months Later and After Attending Multiple Parties at the Fraternity, Ms. Roe Files a False Report of Sexual Misconduct with Penn State's Title IX Office

131.   Ms. Roe continued to frequent parties at the fraternity over the course of the next several months, including a party held the very next evening (September 3, 2022).

132.   During that party, Ms. Roe asked Mr. Doe if she could return to his bedroom to retrieve her underwear, and Mr. Doe walked Ms. Roe to his bedroom so she could look for them.

133.   Mr. Doe remained cordial with Ms. Roe after that weekend but was not interested in pursuing a romantic relationship with her.

134.   During a different party later in September, Mr. Doe caught Ms. Roe and one of her friends in his bedroom without his permission.

135.   Ms. Roe and her friend ran from the bedroom and down the stairs as Mr. Doe approached, and Mr. Doe never learned what they were doing in his bedroom.

136.   During another party several weeks later, Ms. Roe approached Mr. Doe's date and told her to "stay away" from Mr. Doe.

137.    Mr. Doe's date told him about the comment, and Mr. Doe approached Ms. Roe and asked her why she was at the party.

138.    Ms. Roe replied that she believed she and Mr. Doe were friends and asked him if they could stay friends, after which Mr. Doe and Ms. Roe hugged and parted ways.

139.    Mr. Doe had no further communication with Ms. Roe after that conversation.

140.    On November 7, 2022, Ms. Roe filed an informal report with Penn State's Office of Sexual Misconduct Prevention and Response, which is a division of Penn State's Title IX Office.[7]

141.    Ms. Roe alleged for the first time that all instances of sexual intercourse on September 1 and 2, 2022, were nonconsensual.

142.    Ms. Roe claimed that Mr. Doe "physically block[ed]" her from leaving his bedroom after she refused to consent to sexual intercourse and that, at the time of the sexual intercourse, she was "incapacitated" due to the number of alcoholic beverages consumed during the evening.[8]

_____

[7] During the 2022–2023 academic year, Penn State modified the name of this office to the Office of Sexual Misconduct Reporting and Response.

[8] Penn State's Title IX policy allows parties to Title IX proceedings to have time-limited, inspection-only access to their Title IX file.  All allegations regarding the initial Title IX complaint, the investigative reports, email correspondence with the

143.   Ms. Grove assigned Ms. Kern, an Investigator in Penn State's Title IX Office, to investigate Ms. Roe's complaint.

144.   Ms. Kern conducted an interview with Ms. Roe on January 24, 2023.

145.   During the interview, Ms. Roe admitted that she wanted to have sexual intercourse with Mr. Doe on the evening of September 1, 2022, but she falsely claimed that, once they were in his bedroom and she was climbing the ladder to enter his loft bed, she asked Mr. Doe whether he had a condom and decided she wanted to leave when he replied that he did not.

146.   Ms. Roe also falsely claimed that Mr. Doe told her that she could not leave, so she continued climbing the ladder into his bed where the pair proceeded to have sexual intercourse.

147.   At no time on the evening of September 1, 2022, or the morning of September 2, 2022, did Ms. Roe ask Mr. Doe if he had a condom or indicate that a condom was necessary.

148.   At no time on the evening of September 1, 2022, or the morning of September 2, 2022, did Ms. Roe suggest, explicitly or implicitly, to Mr. Doe that she did not want to engage in sexual intercourse or that she wanted to leave.

---

Title IX Office, and the Title IX Hearing are supported by documentary evidence within that case file, but the undersigned counsel were not permitted to copy those documents to attach them to this pleading.

149.    At no time on the evening of September 1, 2022, or the morning of September 2, 2022, did Mr. Doe tell Ms. Roe that she was not allowed to leave his bedroom.

150.    Ms. Roe made additional false claims during her interview as well, alleging, for example, that she was so intoxicated as to be incapacitated, that she was "scared" because Mr. Doe was "angry and aggressive," that she and Mr. Doe continued drinking after going upstairs, and that she overheard someone ask Mr. Doe "if he wanted to 'do more coke.'"

151.    None of these allegations were true either, and as Ms. Roe's story shifted throughout the investigative process and eventually during the Title IX Hearing itself, many of her allegations were diluted, changed, or abandoned entirely.

152.    Those allegations nonetheless informed, and were the sole basis for, Penn State's election to proceed with the case.

**Penn State Conducts a Deeply Flawed and Fundamentally Unfair Title IX Investigation into Ms. Roe's False Report of Sexual Misconduct**

153.    On February 6, 2023, Ms. Kern emailed Ms. Roe a request to initiate a formal Title IX investigation.

154.    On February 10, 2023, Ms. Roe elected to proceed with a formal Title IX investigation.

155.    On February 13, 2023, Ms. Kern emailed Mr. Doe a Notice of Formal Complaint, advising Mr. Doe that Ms. Roe had filed a complaint of sexual misconduct against him and the complaint had been opened for investigation.

156.    The Title IX Office assigned Chad Wright, an employee in Penn State's Office of Student Care and Advocacy, to serve as Mr. Doe's interim "Advisor" during the early stages of the Title IX process.

157.    Advisors are required under Penn State's Title IX policy to assist parties to a Title IX proceeding by accompanying them to meetings and proceedings, advising them in the preparation and presentation of information, conducting cross-examination on behalf of the party they represent during the Title IX hearing, and advising the party in preparation of any appeals.

158.    Mr. Doe met with Mr. Wright after receiving the Notice of Formal Complaint and multiple times throughout the initial months of the investigation to discuss Ms. Roe's allegations and what Mr. Doe should expect from the Title IX process.

159.    During one meeting, Mr. Wright advised that the case would likely come down to a matter of credibility with respect to the question of consent.

160.    Mr. Wright warned Mr. Doe to hedge his expectations, stating something along the lines of "oftentimes" when these investigations revolve around a question of consent, "it becomes a he-said, she-said, and she will win."

161.   When Mr. Doe's father spoke to Mr. Wright several months later and asked why he had not encouraged Mr. Doe to retain a lawyer or seek other assistance in the Title IX proceedings, Mr. Wright repeated the same line: because this was a "he-said, she-said" case, it was a foregone conclusion that "she will win."

162.   Mr. Doe unsurprisingly had little faith in the Title IX process after Mr. Wright, a Penn State employee and experienced Title IX advisor, suggested that Penn State's Title IX Office was likely to favor Ms. Roe based solely on the fact that she was a female accusing a male of sexual misconduct.

163.   On March 2, 2023, Mr. Doe emailed Ms. Kern to alert her that he and Mr. Wright had discussed the Title IX process and that Mr. Doe would like to review the initial Title IX investigative packet prepared by Ms. Kern before sitting for a formal interview.

164.   On April 12, 2023, Penn State assigned Mr. Doe a new Advisor, Amanda Lutz Moore.

165.   Ms. Moore had never previously advised a student in connection with a Title IX proceeding or represented a student at a Title IX hearing.

166.   On April 14, 2023, Ms. Kern circulated the Investigative Draft Report to Mr. Doe for what is known as the "10-Day Review."

167.   During the 10-Day Review, the complainant and respondent have the opportunity to review the contents of the Investigative Draft Report, which contains

party and witness interview summaries and other information collected by the Title IX Office, and provide comments to the Title IX Investigator.

168.   On April 19, 2023, Mr. Doe emailed Ms. Kern and asked to schedule an interview to provide the Title IX Office with his perspective of the events of September 1 and 2, 2022, and to comment on the Investigative Draft Report.

169.   Mr. Doe met with Ms. Kern one week later, on April 26, 2023, together with Ms. Moore.

170.   Mr. Doe explained to Ms. Kern that the sexual intercourse on the evening of September 1, 2022, and on the morning of September 2, 2022, was consensual; that Ms. Roe was an active and willing participant in the sexual activities both during the evening and in the morning and in fact initiated many of them; and that Ms. Roe never gave him any indication that she was uncomfortable with their activities or that she wanted to withdraw her consent.

171.   Mr. Doe told Ms. Kern that Ms. Roe never asked him to provide a condom and never indicated to him that a condom was needed.

172.   Mr. Doe also told Ms. Kern that he never prevented Ms. Roe from exiting his room and that Ms. Roe was neither incapacitated nor otherwise intoxicated to the point of being incapable of providing consent.

173.    Like Ms. Roe, Mr. Doe told Ms. Kern that there were two eyewitnesses in the room, his roommate Witness #1, and Witness #1's eventual girlfriend, Witness #2, who Mr. Doe was able to identify by first name only.

174.    Mr. Doe told Ms. Kern that he did not know Witness #2's last name and that she and Witness #1 had not dated for long, but he would try to find it and report back.

175.    Mr. Doe spoke with Witness #2 after the interview.

176.    Witness #2 expressed hesitation to become involved in the Title IX process and asked that Mr. Doe not share her name with Ms. Kern.

177.    On May 19, 2023, Mr. Doe emailed Ms. Kern and advised that he had spoken with Witness #2, that she did not want to be involved in the process, and that he was going to respect her request not to share her name.

178.    Despite Penn State's Title IX policy placing the burden on the Title IX Office to gather relevant evidence, Ms. Kern and the Title IX Office conducted no further investigation into Witness #2's identity.

179.    Instead, the Title IX Office placed the burden on Mr. Doe to produce evidence of and prove his innocence.

180.    There is no indication, for example, that anyone in the Title IX Office ever asked Ms. Roe if she knew Witness #2's last name.

181.   Ms. Roe and Witness #2 had in fact continued to see each other at parties at the fraternity after September 2, 2022, and the pair became "friends" on Snapchat just two weeks later, on September 16, 2022, and remained "friends" through the fall of 2023.

182.   Witness #2 was also actively involved on campus and listed in the campus directory, and it would not have been difficult for Ms. Kern to identify and contact Witness #2 had she conducted any reasonable effort to do so.

183.   Mr. Doe also spoke with Witness #1 after his interview and asked Witness #1 whether he would be willing to speak to the Title IX Investigator.

184.   Witness #1 told Mr. Doe that he too was hesitant to become involved and would prefer not to be pulled into the investigation unless absolutely necessary.

185.   Neither Ms. Grove, Ms. Kern, Mr. Wright, Ms. Moore, nor anyone else in Penn State's Title IX Office ever suggested to Mr. Doe, much less impressed upon him, that he would be required to prove his own defense and eyewitnesses would be necessary.

186.   Two of the friends that accompanied Ms. Roe to the party on September 1, 2022, including the friend that Ms. Roe texted throughout the evening about her whereabouts and her intention to stay the night with Mr. Doe, also declined to participate in the investigation.

187.    Ms. Kern later testified that such hesitation is common among college students.

188.    Mr. Wright also confirmed separately to Mr. Doe's father that it was not unusual for other students to decline to participate in Title IX investigations.

189.    On May 26, 2023, Ms. Kern circulated the Investigative Draft Report to Mr. Doe for what is known as the "5-Day Review."

190.    Like the 10-Day Review, during the 5-Day Review, the complainant and respondent have another opportunity to review the contents of the updated Investigative Draft Report and provide comments to the Title IX Investigator.

191.    On June 6, 2023, Ms. Kern closed the investigation, and the case was transferred to Ms. Grove for further processing.

**Penn State Receives Exculpatory Information from an Eyewitness Two Weeks Before the Title IX Hearing and Refuses to Continue the Hearing to Accommodate the Eyewitness's Military Obligations**

192.    On June 13, 2023, Ms. Grove sent a letter to Mr. Doe notifying him that a Title IX hearing ("Title IX Hearing" or "Hearing") had been scheduled for 9:00 a.m. on July 17, 2023.

193.    The Title IX Hearing was scheduled to take place virtually by Zoom.

194.    The Notice of Hearing confirmed that there was still time for witnesses to come forward before the Hearing, stating that any new witness who had not met

with Ms. Kern would simply be required to provide a brief statement to Ms. Grove at least three days before the Hearing.

195.    The Hearing would proceed before a three-person factfinding hearing panel ("Hearing Panel" or "Panel") consisting of three University employees, one of whom would serve as the Hearing Chairperson.

196.    The Notice of Hearing advised that the Hearing Panel for Ms. Roe's complaint would consist of three panelists, Rosemary Petrunyak, Jennifer Solbakken, and Gary Miller, and one alternate, Ashley Owens.

197.    Ms. Petrunyak was designated the Hearing Chairperson.

198.    Ms. Grove acknowledged in the Notice of Hearing, consistent with Penn State's Title IX policy, that the Chairperson had discretion to hold the Hearing open beyond July 17, 2023, if circumstances warranted a continuance.

199.    Just days after the Notice of Hearing was issued, Mr. Doe emailed Ms. Kern and advised that Witness #1 had overcome his initial hesitation and wished to provide a statement and participate in the Hearing.

200.    Specifically, in an email sent at 9:06 a.m. on June 16, 2023, Mr. Doe stated:

> Good morning,
>
> [Witness #1] has decided to issue a statement to clear up these allegations.  He is unavailable to do so at the hearing as he will be in Basic Training for the army . . . , so we

will need to reschedule this hearing in accordance with his availability.

201.   Mr. Doe sent a follow-up email two minutes later, adding a request that Ms. Kern please reach out to Witness #1 to schedule an interview as soon as possible.

202.   Ms. Kern did not reply to Mr. Doe's email.

203.   Mr. Doe followed up with Ms. Kern in an email sent at 11:48 a.m. on June 20, 2023, stating:

> This is my second time reaching out to reschedule the hearing date.  If you can't help me with this, then please point me in the direction of someone who will.

204.   Ms. Kern replied to this second email at 12:11 p.m., telling Mr. Doe that his emails had been forwarded to Ms. Grove.

205.   Mr. Doe then emailed Ms. Grove directly at 12:17 p.m., writing:

> Hello
>
> Can we move the hearing up so we can get this matter resolved asap?  My witness cannot make the date of the hearing and has yet to provide an initial statement.  Can we discuss a new date and if you would please reach out to [Witness #1] for his prehearing testimony.

206.   Ms. Grove replied to Mr. Doe at 1:26 p.m., stating: "I will reach out to the prospective witness to determine relevance of what they may offer as well as hearing availability.  When we have our prehearing meeting, I will update you accordingly."

207.   Unbeknownst to Mr. Doe, less than an hour after his email to Ms. Grove regarding Witness #1's ROTC commitment and his unavailability on July 17, Ms. Kern emailed David James Rizzo, Penn State's ROTC Scholarship and Enforcement Officer, asking questions about ROTC cadet availability to participate in Title IX hearings.

208.   It is believed and therefore averred that Ms. Kern emailed Mr. Rizzo at Ms. Grove's direction in light of Mr. Doe's emails.

209.   While Ms. Kern styled her inquiry in generalized terms, indicating the issue had come up a few times over the years, her email was prompted by Mr. Doe's request and Witness #1's ROTC commitment.

210.   Ms. Kern asked Mr. Rizzo if it would be possible for ROTC cadets to be excused from summer training activities for a few hours to attend a Title IX hearing via Zoom.

211.   Mr. Rizzo replied quickly and explained that he believes most ROTC supervisors would support the request and permit a cadet to attend something as "sensitive" as a Title IX hearing, and that there is only one window during summer training during which cadets would be truly "unavailable."

212.   Mr. Rizzo offered to follow up on behalf of the Title IX Office if any request for Zoom participation in a hearing was rejected or met with resistance.

213.    When Ms. Kern replied with a question about logistics—who the request should come from, and whether a justification letter from the Title IX office is needed—Mr. Rizzo answered that he did not think a justification letter is necessary and reiterated that he thinks most supervisors would approve the request.

214.    Mr. Rizzo copied Penn State's Professor of Military Science, Lieutenant Colonel Daniel Gross, on this latter email, and reiterated that Ms. Kern could reach out to either of them "with regards to a specific situation and/or issue."

215.    The email exchange ends at 1:47 p.m. the same day.

216.    It is believed that therefore averred that neither Ms. Kern, Ms. Grove, nor anyone in the Title IX Office ever pursued the option of having Witness #1 testify at the Title IX Hearing via Zoom from his ROTC summer training with Mr. Rizzo, Lieutenant Colonel Gross, or anyone else.

217.    No one from the Title IX Office ever contacted Witness #1 and advised him of the option of attending the Title IX Hearing remotely.

218.    Nor did anyone from the Title IX Office contact Mr. Doe to advise him of the remote testimony option for Witness #1.

219.    Ms. Grove emailed Witness #1 on June 28, 2023, and asked him to provide his availability for an informational meeting.

220.    Witness #1 replied that his availability was severely limited given his preparation for an Army training event for which he would leave on July 10, but that he could meet any time after 2:00 p.m. on July 1 and any time on July 5.

221.    Witness #1 received no further communications from the Title IX Office until July 5 at 1:25 p.m., when Ms. Kern emailed him stating: "The Title IX Coordinator indicated that you would like to possibly meet with me. My bookings link is below. It will probably have to be tomorrow [July 6] or Friday [July 7] as I am out next week."

222.    Ms. Kern never met with Witness #1.

223.    Instead, presumably because of Ms. Kern's delayed response and limited availability, Ms. Grove met with Witness #1 herself on July 5, 2023, and conducted an interview of Witness #1 via Zoom.

224.    During the interview, Witness #1 advised Ms. Grove that:

a.    He observed Ms. Roe and Mr. Doe hanging out at the party on the night of September 1, 2022;

b.    Ms. Roe stayed the night in his and Mr. Doe's shared bedroom on September 1, 2022;

c.    He both heard and observed Ms. Roe and Mr. Doe having sexual intercourse on the morning of September 2, 2022, and that Ms. Roe was a "willing participant;" and

d.    He at no point heard or observed anything that would have led him to believe that Ms. Roe did not consent to the sexual activities on the morning of September 2, 2022.

225.   Ms. Grove did not tell Witness #1 that her Office had learned that his ROTC supervisor would likely allow him to take a break from training to offer testimony at the Title IX Hearing given the seriousness of the proceeding.

226.   Ms. Grove also did not ask Witness #1 for Witness #2's last name or contact information.

227.   Ms. Grove met with Mr. Doe and Ms. Moore for a prehearing meeting the next day, July 6, 2023.

228.   Ms. Grove informed Mr. Doe and Ms. Moore that she had a meeting with Witness #1 the day before but did not share any information about the statement he had provided.

229.   Ms. Grove advised Mr. Doe and Ms. Moore that she did not believe Witness #1 would be able to attend the Title IX Hearing due to his ROTC commitment.

230.   Ms. Grove did not tell Mr. Doe or Ms. Moore that her Office had learned that Witness #1's ROTC supervisor would likely allow him to take a break from training to offer testimony given the seriousness of the proceeding.

231.   Mr. Doe, through Ms. Moore, requested for the third time that the Hearing be continued to accommodate Witness #1's military obligation.

232.   Ms. Moore told Ms. Grove that it would be fundamentally unfair to proceed with a Title IX Hearing without Witness #1—a material, exculpatory

eyewitness who was unavailable on the Hearing date solely because of a military obligation.

233.   Ms. Grove inexplicably refused to exercise her discretion to continue the Title IX Hearing, knowing full well that doing so would mean withholding material, exculpatory eyewitness testimony from the Hearing Panel.

**Penn State Misrepresents Witness #1's Willingness to Testify and Conceals His Exculpatory Statement from the Title IX Hearing Panel**

234.   The Title IX Hearing proceeded as scheduled on July 17, 2023.

235.   The Hearing was conducted by Zoom.

236.   In addition to Mr. Doe, Ms. Roe, and their respective advisors, the following individuals attended the Hearing: (a) Ms. Grove, in her capacity as Title IX Coordinator; (b) Ms. Kern, in her capacity as Title IX Investigator and Witness; (c) Kelly Ann Mroz, in her capacity as Assistant General Counsel for Penn State and Advisor to the Hearing Panel; (d) Ms. Petrunyak, Hearing Panel Member and Chairperson; (e) Ms. Solbakken, Hearing Panel Member; (f) Mr. Miller, Hearing Panel Member; and (g) Ms. Owens, Alternate Hearing Panel Member.

237.   Witness #1 did not attend the hearing because of his ROTC commitment and because no one from Penn State's Title IX Office ever informed him of the option to testify remotely.

238.   Ms. Petrunyak opened the Hearing by explaining various rules and procedures that would apply during and following the Hearing.

239.    Ms. Petrunyak stated that the Hearing Panel had the discretion to hold the hearing open to "request additional records and/or witnesses" prior to making its decision.

240.    Ms. Petrunyak then allowed Ms. Roe to make her opening statement.

241.    Ms. Roe testified that she was a willing participant in sexual activities with Mr. Doe on the evening of September 1, 2022, and she was comfortable having sex with him at the time they entered his bedroom.

242.    Ms. Roe also testified that she willingly undressed herself and willingly began climbing the ladder into Mr. Doe's bed.

243.    Under oath, Ms. Roe contradicted, abandoned, and materially altered many of her earlier allegations, including:

> a.    Ms. Roe previously claimed that she had an additional 1.5 alcoholic beverages while she and Mr. Doe were upstairs in the "hangout room," but at the Hearing admitted "there was no drinking upstairs;"
>
> b.    Ms. Roe had previously claimed that Mr. Doe "physically block[ed]" her from leaving the room after their alleged conversation about a condom, but at the hearing testified that she was voluntarily climbing the ladder and that Mr. Doe did not stop her from exiting.  Rather, Ms. Roe said that Mr. Doe happened to be physically positioned halfway between Ms. Roe and the door;
>
> c.    Ms. Roe retreated from her allegation that Mr. Doe had been "angry and aggressive" toward her, admitting her only basis for that statement was that Mr. Doe had accidentally fallen into her at one point while they were on the dance floor;

d.  Ms. Roe claimed during the investigation that she believed Mr. Doe had done drugs on September 1, 2022, because she overheard "a girl . . . ask[] [Mr. Doe] if he wanted to 'do more coke' and he declined."  But by the time of the hearing, Ms. Roe changed her claim to having overheard a conversation in which Mr. Doe allegedly said he had done drugs; and

e.  Ms. Roe claimed in the initial complaint that she was so drunk as to be completely "incapacitated" and incapable of consent.  Yet, Ms. Roe testified at the Hearing that she was able and willing to consent to sexual intercourse with Mr. Roe on the night of September 1, 2022.

244.  Ms. Roe admitted during the Hearing that she had access to her cell phone throughout the entire night and next morning and could have used it to contact her friends or anyone else if she was uncomfortable and wanted to leave.

245.  Ms. Roe further admitted that both Witness #1 and Witness #2 were in the bedroom on the night of September 1, 2022, and on the morning of September 2, 2022, although she claimed that Witness #2 had left the room before the sexual intercourse began in the morning.

246.  Ms. Roe conceded that she never expressed or otherwise indicated to either Witness #1 or Witness #2 that she was uncomfortable or wanted to leave.

247.  Ms. Roe admitted that she could have left of her own accord after Mr. Doe went to sleep if she had been uncomfortable and wanted to leave but she instead chose to stay the night.

248.  Mr. Doe also provided testimony during the hearing.

249.   Mr. Doe maintained, under oath, that Ms. Roe had willingly consented to sexual intercourse on the night of September 1, 2022, and the morning of September 2, 2022.

250.   Mr. Doe testified that Ms. Roe was an active participant in the sexual intercourse and that she demonstrated her consent by, among other things, agreeing to go upstairs with Mr. Doe and later agreeing to go to his bedroom to have sex, kissing Mr. Doe, physically touching and engaging in foreplay with Mr. Doe, and voluntarily climbing into Mr. Doe's bed.

251.   Mr. Doe denied any conversation about condoms, and in response to a question from Mr. Miller, told the Hearing Panel that he had condoms available in his room had Ms. Roe ever requested that they use one.

252.   Mr. Doe also denied Ms. Roe's evolving claim that she thought he may have done drugs on September 1, 2022.

253.   Mr. Doe explained that the only reason he locked the door on the night of September 1, 2022, was to ensure he and Ms. Roe had privacy.

254.   Mr. Doe added that he never "physically block[ed]" Ms. Roe from leaving his bedroom, nor did he tell her or otherwise indicate to her that she was not free to leave.

255.   Mr. Doe testified that the only reason he placed his finger over Ms. Roe's mouth and whispered to Ms. Roe to be "quiet" on the morning of September

2, 2022, was because he believed Witness #1 and Witness #2 were still sleeping, refuting Ms. Roe's claim that Witness #2 was not present.

256.    Mr. Doe told the Hearing Panel unequivocally, as he had told Ms. Kern, that Ms. Roe never once on the evening of September 1, 2022, or on the morning of September 2, 2022, through her conduct or her words, suggested to Mr. Doe that she was wanted to stop their sexual activities, nor did she do anything to indicate that she was either incapacitated or otherwise incapable of consenting to sexual intercourse.

257.    Ms. Kern also provided sworn testimony about the investigation during the Title IX Hearing.

258.    Recognizing the importance of eyewitness testimony in this case, one Hearing Panel Member pressed Ms. Kern regarding the efforts she took to reach these witnesses.

259.    With respect to Witness #2, Ms. Kern testified only that she "could not ascertain" her last name.

260.    She did not describe any efforts to identify Witness #2 other than pressing Mr. Doe to reveal Witness #2's last name against her consent.

261.    Ms. Kern also testified that she had attempted to contact Witness #1 during the investigation and received "no response."

262.    Ms. Kern then told the Hearing Panel that, although "there was some additional questions about whether [Witness #1] could participate" after the investigation was completed and had been transferred to Ms. Grove for administration, he "was given some additional time to do that and sent written questions" but, per Ms. Kern, he "did not respond to those as well."

263.    Ms. Kern knew at the time of her testimony that Witness #1 not only was willing to provide a statement and testify at the Hearing, but that he had in fact met with Ms. Grove less than two weeks earlier and provide a full statement.

264.    Ms. Kern knew at the time of her testimony that Witness #1's statement was highly exculpatory to Mr. Doe and corroborated Mr. Doe's testimony that Ms. Roe was a willing and consenting participant in the sexual intercourse on the morning of September 2, 2022.

265.    Ms. Kern nonetheless lied to the Hearing Panel and claimed Witness #1 had been and remained nonresponsive, failed to disclose that he had provided an exculpatory statement to Ms. Grove less than two weeks prior, and misled the Hearing Panel—which clearly wanted to hear from Witness #1 and Witness #2—to believe that Witness #1 did not want to speak to them.

266.    Ms. Kern also did not disclose to the Hearing Panel that the only reason for Witness #1's absence from the Hearing was because her Office had refused to continue the Hearing to accommodate his military obligation or to pursue the remote

testimony option that Ms. Kern had confirmed with Mr. Rizzo would be available under most circumstances while Witness #1 was away for ROTC training.

267.   Ms. Grove, in her capacity as Penn State's Title IX Coordinator, also was in attendance at the Hearing as a representative of the Title IX Office.

268.   Ms. Grove saw and heard her employee, Ms. Kern, lie to the Hearing Panel and falsely state that Witness #1 had not been responsive to the Title IX Office and suggest that he was unwilling to speak to the Hearing Panel.

269.   In total dereliction of her duty to ensure fair and impartial enforcement of Penn State's Title IX policy, Ms. Grove remained silent in the face of testimony from her employee that she knew to be incorrect.

270.   Ms. Grove did not tell the Hearing Panel that Ms. Kern was wrong and that Witness #1 was responsive.

271.   Ms. Grove did not tell the Hearing Panel that Witness #1 wanted to participate in the Hearing.

272.   Ms. Grove did not tell the Hearing Panel that the only reason Witness #1 was not present at the Hearing was because of a military training obligation and Penn State's unwillingness to pursue a remote testimony option or to reschedule the Hearing.

273.   And most egregiously, Ms. Grove did not tell the Hearing Panel that Witness #1 had provided a statement to her less than two weeks prior to the Hearing

in which he unequivocally exculpated Mr. Doe with respect to Ms. Roe's allegations of nonconsensual sexual intercourse on the morning of September 2, 2022.

274.   Given the Hearing Panel's questions regarding eyewitnesses, it is all but certain the Hearing Panel would have held the proceeding open to hear from Witness #1 had they known he was willing to speak to them.

275.   Ms. Grove and Ms. Kern both were aware that Penn State's Title IX policy allows the Hearing Panel to hold a Title IX hearing open to consider new evidence and witnesses.

276.   The only explanation for Ms. Grove's and Ms. Kern's failure to disclose Witness #1's exculpatory statement and willingness to testify is that Ms. Kern, Ms. Grove, and Penn State's Title IX Office were motivated by external pressures—including, but not limited to, the OCR Compliance Review Letter and *Centre Daily Times* article—to ensure that the Hearing Panel found Mr. Doe, a male, responsible, as false reassurance to the female student population that the University takes Title IX complaints seriously.

277.   As a result, the Title IX Hearing concluded without the Hearing Panel ever being made aware that Witness #1 had provided a statement exonerating Mr. Doe.

### Mr. Doe Is Suspended Indefinitely Based on Penn State's Biased Investigation and Concealment of Exculpatory Evidence

278.    On July 25, 2023, Ms. Grove issued a "Notice of Outcome—University Title IX Hearing" to Mr. Doe.

279.    The Notice of Outcome reported that the Hearing Panel had found Mr. Doe responsible for violating Penn State's Title IX policy with respect to the sexual intercourse on the morning of September 2, 2022.

280.    The Panel found Mr. Doe not responsible with respect to the sexual intercourse on the night of September 1, 2022.

281.    The Notice of Outcome acknowledged that the parties' statements regarding the morning of September 2, 2022, "were conflicting regarding the issue of consent," so "the decision came down to that of credibility."

282.    Consistent with Mr. Wright's intimation that a Penn State Title IX proceeding on the issue of consent would favor the female, the Panel found Ms. Roe "to be the more credible party" based on the fact that Ms. Roe had mentioned having an early morning class and their view that Mr. Doe's actions in mouthing "quiet" to Ms. Roe and joking that she may be a little late "could reasonably have been perceived as aggressive."

283.    The Hearing Panel also cited as a basis for its finding the fact that Mr. Doe had declined to provide Witness #2's last name to the Title IX Investigator absent her consent.

284.   As a result of the finding, Mr. Doe was suspended indefinitely from Penn State, effective immediately and for a minimum period of at least two years.

285.   The Notice of Outcome provided that Mr. Doe could request that the suspension be lifted after a two-year period, subject to satisfaction of various counseling and other conditions.

286.   The decision whether to lift the indefinite suspension is left to the University's sole discretion.

287.   Ms. Grove signed and issued the Notice of Outcome knowing that the Hearing Panel's decision had come down to "credibility" and that she and others in the Title IX Office had deliberately concealed exculpatory information that went directly to that issue.

**Penn State Refuses to Provide Additional, Exculpatory Information to the Appeals Officer to Rectify Its Misconduct When Brought to Light by Mr. Doe's Prior Counsel**

288.   Mr. Doe promptly appealed the Notice of Outcome to Penn State's Title IX Appeals Officer, Alan J. Rieck, on July 31, 2023.

289.   Mr. Doe retained counsel, Laura-Michelle Horgan, Esquire, shortly after filing his appeal.

290.   Attorney Horgan immediately began an investigation and, on August 11, 2023, conducted an interview of Witness #2.

291.   On August 14, 2023, Attorney Horgan wrote to Ms. Grove, copy to Ms.

Mroz, detailing the information she learned from Witness #2, including that:

  a. When Witness #2 awoke on the morning of September 2, 2022, she observed Ms. Roe having sexual relations with Mr. Doe;

  b. Witness #2 specifically observed that Ms. Roe was on top of Mr. Doe while they were engaged in sexual relations; and

  c. Witness #2 stated that nothing she saw or heard that morning suggested that Ms. Roe did not consent to the sexual intercourse or otherwise wanted to leave.

292.   According to Attorney Horgan, Witness #2 also stated that while she

was listed in the campus directory, was very involved on campus, and was friends

with Ms. Roe on Snapchat, Ms. Roe did not list her as a witness nor did anyone from

the Title IX Office contact her and ask her to testify.

293.   Ms. Mroz replied to Attorney Horgan's letter on August 15, 2023,

advising that the Hearing Panel would not consider the additional evidence provided

in Attorney Horgan's letter, nor would the evidence be provided to the Appeals

Officer.

294.   Attorney Horgan wrote to Penn State a second time on August 18, 2023,

this time directly to Ms. Mroz.

295.   Attorney Horgan advised Ms. Mroz that Witness #1 had just returned

from Army ROTC training and had provided an interview to Attorney Horgan.

296.    During his interview, Witness #1 confirmed that he was present during the sexual intercourse between Mr. Doe and Ms. Roe on the morning of September 2, 2022, and the sexual intercourse was consensual.

297.    Attorney Horgan expressed concern that, although Witness #1 stated he had provided this exact account of events to Ms. Grove during an interview two weeks before the Title IX Hearing, the Hearing Panel's decision inexplicably made no mention of Witness #1's statement, nor his and Mr. Doe's repeated requests for a continuance of the hearing to accommodate Witness #1's availability.[9]

298.    Neither Ms. Grove nor Ms. Mroz took any action to remedy the serious procedural issues brought to their attention by Attorney Horgan.

299.    Three days later, on August 21, 2023, the Appeals Officer issued a decision affirming the Notice of Outcome.

300.    The Appeals Officer concluded that, because "the information from [Witness #1] was available at the time of the hearing, but he chose not to participate in the investigation in any way," his information was not new evidence warranting a remand for a new hearing.

---

[9] It was not until undersigned counsel reviewed the Title IX Hearing video recording in February 2024 that it became apparent that Ms. Grove was in attendance at the Title IX Hearing, and both failed to correct Ms. Kern's false testimony about Witness #1's availability and failed to disclose her own interview with Witness #1 two weeks prior.

301.   With respect to Witness #2, the Appeals Officer faulted Mr. Doe for respecting Witness #2's initial hesitation to participate in the Title IX process, claiming Mr. Moorhead "deliberately withheld identifying and contact information that would allow the investigator to invite [Witness #2] to participate in the investigation" and thus concluding that Witness #2's testimony also was not new evidence warranting a remand for a new hearing.

### Penn State's Conduct in Investigating Ms. Roe's False Report of Sexual Misconduct Is Part of a Pattern and Practice of Anti-Male Discrimination in Title IX Investigations by the University

302.   Penn State has utterly failed in practice to achieve the fairness and gender parity promised in its Title IX policy.

303.   Penn State has fostered an environment that evinces anti-male bias both within its Title IX investigations and more broadly.

304.   Despite its Title IX policy purporting to place the burden of gathering evidence on the University, the University has fostered an environment in which the burden shifts to accused students, and male students in particular, to gather evidence proving their innocence.

305.   For example, both the Hearing Panel and the Appeals Officer faulted Mr. Doe—the male respondent—for not providing contact information for Witness #2, but no one ever bothered to ask Ms. Roe—the female complainant who lodged the false accusation—if she knew Witness #2's last name or contact information.

306.   Mr. Doe's first advisor, Mr. Wright, confirmed to Mr. Doe that the Title IX process at Penn State favors female students when it comes to questions of credibility.

307.   Mr. Wright reiterated that bias when he spoke to Mr. Doe's father several months later.

308.   This anti-male undercurrent runs throughout Penn State's Title IX prevention and education messaging as well.

309.   For example, Penn State has published an "It's On Us" collection of educational videos depicting scenarios involving sexual assault, stalking, and intimate partner harassment and violence.[10]

310.   Penn State's videos feature only male aggressors and either female or same-sex victims.

311.   Penn State's published Title IX statistics suggest the University is aware of the effect if its anti-male bias on the processing of Title IX complaints.

312.   Penn State's Office of Sexual Misconduct Reporting and Response releases an annual End of Year Report providing statistical information about Title

---

[10] True and correct copies of the "It's On Us" videos have been submitted to the Clerk of Court on a thumb drive marked **Exhibit E**. The videos are also available on Penn State's Title IX Prevention and Education website at the following link: https://universityethics.psu.edu/our-expertise/title-ix/prevention.

IX complaints filed with the University over the course of the preceding academic year.

313.   The Office of Sexual Misconduct Reporting and Response breaks the number of filed cases down by gender.

314.   For the 2022–2023 academic year, for example, Penn State published the following infographic in its annual report,[11] depicting the proportion of complaints filed by and against "men," "women," and students of "gender unknown or other":




315.   But when it comes to how the University responded to those complaints (*i.e.*, by either informal resolution or initiating a formal investigation), the report abandons gender breakdowns and provides numerical data only:

---

[11] A true and correct copy of the Office of Sexual Misconduct Reporting and Response's 2022–2023 End of Year Report is attached hereto as **Exhibit F**.



316. Likewise, when the University breaks down post-investigation outcomes (*i.e.*, finding and sanction; no charge or finding; informal resolution; or voluntary separation from University), it does not report outcomes based on gender:



317. It is believed and therefore averred that Penn State does not report case responses and case outcomes by gender because doing so would provide further objective evidence of the University's demonstrated an anti-male bias.

**Defendants' Willful Violation of Mr. Doe's Due Process and Title IX Rights Has Irreparably Harmed Mr. Doe**

318.   Mr. Doe has been harmed in immeasurable and irreparable ways as a result of the false report of sexual misconduct filed by Ms. Roe and Defendants' actions in administering a biased proceeding toward a predetermined outcome based solely upon Mr. Doe's status as a male respondent.

319.   Mr. Doe has been denied the benefits of education at his chosen school, an institution he previously revered and trusted.

320.   Since having been suspended from Penn State, Mr. Doe has been denied admission to other colleges.

321.   Because Mr. Doe otherwise has a strong academic and extracurricular record, it is believed and therefore averred that these denials were the result of the notation of discipline on his transcript.

322.   Mr. Doe has suffered a delay in his higher education and a resulting delay in his entry into the professional workforce.

323.   Although Mr. Doe ultimately was successful in enrolling at another institution, Mr. Doe will have to explain to prospective employers for the remainder of his professional life why his transcript and resume contain a significant temporal gap.

324.   Mr. Doe's familial and personal relationships have suffered and continue to suffer as Mr. Doe processes the sanction unfairly imposed upon him, the

abuse of trust by the University, and the lifelong ramifications of the wrongs done to him.

325.   All of this is in addition to the untold economic harms Mr. Doe has suffered and will continue to suffer which include, but are not limited to, lost tuition, lost wages from his employment while a student at Penn State, delayed and diminished future earning capacity, and lost career and business opportunities.

## CAUSES OF ACTION

### COUNT I
### Section 1983 – Procedural Due Process
### (Plaintiff v. Defendants Grove and Kern)

326.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

327.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. IX.

328.   Section 1983 of Title 42 of the United States Code establishes a private cause of action for violation of constitutional rights by state actors.  42 U.S.C. § 1983.

329.   Ms. Grove and Ms. Kern are state actors for purposes of Section 1983.

330.  It is clearly established that individuals have a constitutionally protected liberty interest in their good name, reputation, and integrity, and cannot be deprived of those interests without due process of law.

331.  It further is clearly established that individuals have a constitutionally protected liberty and property interest in pursuing their education, and that certain minimum procedural due process protections therefore apply to student disciplinary proceedings.

332.  Those protections require that a public educational institution provide a student facing disciplinary proceedings adequate notice of the allegations against them and a meaningful opportunity to be heard before an impartial decisionmaker.

333.  Ms. Grove and Ms. Kern, individually and together, deprived Mr. Doe of his right to a meaningful opportunity to be heard before an impartial decisionmaker, prevented Mr. Doe from presenting a meaningful defense, and violated Mr. Doe's due process rights in at least the following ways:

     a.    Proceeding with an assumption that a female's accusations are true, a male's denials are false, and Title IX complaints should be resolved in favor of the female;

     b.    Failing to conduct a reasonable investigation into Ms. Roe's Title IX complaint, including, but not limited to, failing to exercise any independent effort, as required by Penn State's Title IX policy, to identify Witness #2, a material eyewitness;

     c.    Improperly placing the burden on Mr. Doe, in violation of Penn State's Title IX policy, to identify Witness #2 against her consent and to prove his own innocence;

    d.    Refusing to exercise their discretion, under Penn State's Title IX policy, to briefly continue the Title IX Hearing to accommodate Witness #1's military commitment, knowing Witness #1 to be a material eyewitness according to both Mr. Doe and Ms. Roe;

    e.    Failing to alert Witness #1 to the option to testify remotely at the Title IX Hearing after refusing to reschedule same;

    f.    Failing to disclose to the Title IX Hearing Panel that Witness #1 was willing to participate in the Title IX investigation and that the only reason he was not present during the Title IX Hearing was because the Title IX Office had refused multiple requests to continue the Hearing to accommodate his military commitment or to alert him to the option to testify remotely after refusing to reschedule same;

    g.    Failing to disclose to the Title IX Hearing Panel that Witness #1 had provided an exculpatory statement to Ms. Grove less than two weeks before the Title IX Hearing;

    h.    Affirmatively misrepresenting to the Title IX Hearing Panel that Witness #1 was nonresponsive and was unwilling to participate in the Title IX Hearing despite Witness #1 having participated in an interview with Ms. Grove and expressed his willingness to participate in the Hearing less than two weeks prior;

    i.    Deliberately concealing material exculpatory information from the Title IX Hearing Panel with the aim of achieving a predetermined result in favor of a female student and against a male student; and

    j.    Failing to provide information obtained by Ms. Horgan to the Appeals Officer demonstrating the procedural irregularities and constitutional violations during the Title IX investigative and hearing processes.

334. Ms. Grove further deprived Mr. Doe of his right to a meaningful opportunity to be heard before an impartial decisionmaker and flagrantly violated

Mr. Doe's due process rights in her capacity as a supervisor, in that she both established and maintained policies, practices, and customs that directly caused Mr. Doe's harm and also participated in, directed, and had knowledge of and acquiesced in Ms. Kern's violations of Mr. Doe's constitutional rights.

335.    Ms. Grove's and Ms. Kern's actions, independently and collectively, deprived Mr. Doe of his liberty and property interests without affording him basic due process protections, including, but not limited to, his right to a fair and impartial investigation, his right to a meaningful opportunity to be heard and present a defense, his right to present evidence and witnesses in support of his defense, his right to a fair adjudication, and his right to be heard before an impartial factfinder.

336.    Accordingly, Ms. Grove and Ms. Kern are liable to Mr. Doe for violations of the Due Process Clause of the Fourteenth Amendment and for all damages arising therefrom.

337.    As a direct and proximate result of Ms. Grove's and Ms. Kern's conduct, Mr. Doe has suffered and continues to suffer ongoing harm, including mental and emotional distress; damage to his reputation; delay of his education; delayed and diminished future earning capacity; lost career and business opportunities; litigation expenses including attorney's fees; and tremendous other economic and noneconomic damages.

338.   Ms. Grove and Ms. Kern have acted willfully, maliciously, and with reckless disregard to Mr. Doe's rights, entitling him to recovery of punitive damages.

**COUNT II**
***Monell* – Procedural Due Process**
**(Plaintiff v. Defendants Penn State and Amber Grove)**

339.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

340.   Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, failed to promulgate policies that were effective to ensure that students' due process, statutory, and other civil rights are protected in student disciplinary proceedings initiated and conducted by the University.

341.   To the contrary, upon information and belief, Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, developed an unwritten policy and practice of steering student disciplinary proceedings toward predetermined outcomes, depriving students of, among other things, their rights to a fair and impartial investigation, to a meaningful opportunity to be heard and present a defense, to present evidence and witnesses in support of their defense, to a fair adjudication, and to be heard before an impartial factfinder.

342.   Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, further developed a custom or practice of discriminating against male

students in student disciplinary proceedings initiated and conducted by the University.

343.   Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, further developed a custom or practice of violating those written policies that do exist in response to various external pressures, including, without limitation, developing customs or practices of proceeding with an anti-male bias in student disciplinary proceedings, applying a presumption of guilt to male students in student disciplinary proceedings, improperly placing the burden of proving innocence on male students in student disciplinary proceedings, withholding and misrepresenting evidence in student disciplinary proceedings against male students to ensure a result that favors female students, and fostering an investigative and disciplinary environment that is slanted in favor of female students.

344.   Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, failed to develop, implement, and maintain adequate training policies to ensure adequate, reliable, and impartial Title IX investigations free from gender bias, despite knowing that such policies were necessary and existing policies were deficient following the OCR Compliance Review letter and the pattern of statutory and constitutional violations detailed therein.

345.   Defendant Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, caused a policy, practice, or custom of failing to supervise and

monitor Title IX staff to ensure adequate, reliable, and impartial Title IX investigations, including, with respect to Penn State, as to Ms. Grove herself, despite knowing that such monitoring and supervision was necessary and existing policies were deficient following the OCR Compliance Review letter and the pattern of statutory and constitutional violations detailed therein.

346.  The actions and conduct of Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, reflect a conscious disregard for and deliberate indifference to the constitutional and statutory rights of students and, in particular, male students at the University.

347.  Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, have, through the above-described actions, deprived Mr. Doe of the clearly established and fundamental rights to procedural due process as secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

348.  The actions and conduct of Defendants Penn State and Ms. Grove, in her capacity as a policymaker for Penn State, directly and proximately caused and were the moving force behind the deprivation of Mr. Doe's clearly established constitutional and statutory rights.

349.  As a direct and proximate result of Defendants' conduct, Mr. Doe has suffered and continues to suffer ongoing harm, including mental and emotional

distress; damage to his reputation; delay of his education; delayed and diminished future earning capacity; lost career and business opportunities; litigation expenses including attorney's fees; and tremendous other economic and noneconomic damages.

350.    Penn State and Ms. Grove have acted willfully, maliciously, and with reckless disregard to Mr. Doe's rights, entitling him to recovery of punitive damages.

**COUNT III**
**Title IX – Sex Discrimination**
**(Plaintiff v. Defendant Penn State)**

351.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

352.    Title IX of the Education Amendments of 1972 states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a).

353.    As a recipient of federal funding, Penn State is required to fully comply with the provisions of Title IX and its attendant regulations.

354.    Penn State failed to conduct a fair and impartial investigation as required by Title IX and Penn State's Title IX policy, as demonstrated by the many violations of Penn State's Title IX policy and Mr. Doe's due process rights set forth above.

355.   Penn State maintains and implements practices and procedures that discriminate on the basis of sex against male students with respect to Title IX complaints, including, without limitation, proceeding with an anti-male bias in Title IX investigations, applying a presumption of guilt to male students in Title IX proceedings, improperly placing the burden of proving innocence on male students in Title IX proceedings, withholding and misrepresenting evidence in Title IX proceedings against male students to ensure a result that favors female students, and fostering an investigative and disciplinary environment that is slanted in favor of female students.

356.   Penn State's practices effectuate a denial of constitutional and statutory process for the entire student population, and especially the male student population, because they encourage and validate false reports by female students rather than fulfilling the Title IX Office's statutorily mandated truth-seeking function and non-discrimination objectives.

357.   Penn State's practices further effectuate a denial of constitutional and statutory process for the entire student population, and especially the female student population, because a practice of encouraging false reports of sexual misconduct by female students undermines trust in victims who come forward with genuine claims of sexual misconduct.

358.   Penn State's practices not only deliberately target male students, they also disproportionately affect male students as a result of the higher incidence of female complainants of sexual misconduct.

359.   Penn State further failed to hire a competent Title IX Coordinator or to properly train its Title IX Coordinator as reflected in Ms. Grove's development and implementation of policies, practices, and customs which discriminate against male students in Title IX proceedings.

360.   As a direct and proximate cause of Defendants' conduct, Mr. Doe has suffered and continues to suffer ongoing harm, including mental and emotional distress; damage to his reputation; delay of his education; delayed and diminished future earning capacity; lost career and business opportunities; litigation expenses including attorney's fees; and tremendous other economic and noneconomic damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff John Doe requests that this Court enter judgment in his favor and against Defendants and grant the following relief:

a.    Declare Defendants' conduct unlawful;

b.    Direct Defendants to vacate the Notice of Outcome, expunge Mr. Doe's Title IX disciplinary record, lift all sanctions imposed against Mr. Doe, and permit Mr. Doe to re-enroll at Penn State immediately;

c.    Award compensatory damages in an amount to be determined at trial, including an award of prejudgment interest;

d.      Award punitive damages;

e.      Grant attorneys' fees and costs; and

f.      Order such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Mr. Doe respectfully demands a trial by jury of all issues triable by a jury in this case.

Respectfully submitted,

BABST CALLAND, CLEMENTS AND ZOMNIR P.C.

*/s/ Casey Alan Coyle*
Casey Alan Coyle, Esquire
PA ID No. 307712
Stefanie Pitcavage Mekilo, Esquire
PA ID No. 312720
409 N. 2nd Street, Suite 201
Harrisburg, PA 17101
(267) 939-5832
ccoyle@babstcalland.com
smekilo@babstcalland.com
*Counsel for Plaintiff John Doe*

Dated:  December 9, 2024